J-A29036-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
:
:
KAVAUGHN KIRKLAND :
:
Appellant : No. 1493 WDA 2024

Appeal from the Judgment of Sentence Entered October 24, 2024
In the Court of Common Pleas of Allegheny County Criminal Division at
No(s): CP-02-CR-0002895-2024

BEFORE: OLSON, J., DUBOW, J., and BENDER, P.J.E.

MEMORANDUM BY BENDER, P.J.E.: **FILED: MARCH 3, 2026**

Appellant, Kavaughn Kirkland, appeals from the judgment of sentence

imposed following his convictions for carrying a firearm without a license and

careless driving.[1] Appellant challenges the denial of his motion to suppress

the firearm recovered from his vehicle following a traffic stop. We affirm.

The trial court summarized the facts as follows:

> Officers Dalton DuBrosky and Daniel Halaszynski were City
> of Pittsburgh police officers and partners. On or about March 29,
> 2024, the officers conducted a traffic stop of a vehicle for careless
> driving in the South Side area of Pittsburgh. Specifically, the
> [o]fficers testified that the vehicle was stopped for careless driving
> in a high pedestrian traffic area. Officer DuBrosky credibly
> testified that [Appellant] was stopped for driving too quickly and
> carelessly in the area where there is a high volume of pedestrians.
>
> * * *

---

[1] 18 Pa.C.S. § 6106a)(1); 75 Pa.C.S. § 3714.

Upon approaching the vehicle, [o]fficers observed what they described as furtive movements inside the vehicle from the front seat driver. Due to the movements observed in the vehicle, Officer DuBrosky asked if there were any firearms in the vehicle, to which [Appellant] replied no. However, Officer DuBrosky was notified by Officer Halaszynski via a non-verbal cue that there was a firearm in plain view on the front passenger seat.

Trial Court Opinion (TCO), 2/10/25, at 1-2.

Officer Halaszynski seized the firearm, and Appellant was charged with carrying a firearm without a license, receipt of stolen property, and two summary offenses. Appellant filed a motion to suppress, which the trial court denied following a hearing. The parties proceeded to a stipulated bench trial and the trial court found Appellant guilty of carrying a firearm without a license and careless driving.[2] Appellant filed a timely notice of appeal and complied with the order to file a Pa.R.A.P. 1925 concise statement. The trial court filed its responsive opinion, and Appellant raises three issues for our review.

1. Whether the trial court erred when it denied suppression where police officers initiated a traffic stop without probable cause?

2. Whether the trial court erred when it denied suppression where police officers, without reasonable suspicion, subjected [Appellant] to an illegal investigative detention when they did not have reason to believe he was engaged in criminal activity?

3. Whether the evidence was insufficient to convict [Appellant] of Firearms Not to be Carried Without a License where the Commonwealth failed to prove, beyond a reasonable doubt, that [Appellant] had constructive possession of the firearm that was found on the front passenger seat of the vehicle?

Appellant's Brief at 6.

_____

[2] The Commonwealth withdrew the receipt of stolen property charge, and the trial court found Appellant not guilty of the remaining summary offense regarding open alcoholic beverages.

Appellant's first two issues challenge the trial court's denial of his motion to suppress. The following principles dictate our review:

> [T]he standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, [the appellate court is] bound by [those] findings and may reverse only if the court's legal conclusions are erroneous.

*Commonwealth v. Jones*, 988 A.2d 649, 654 (Pa. 2010) (internal citations and quotation marks omitted).

Appellant's first issue challenges the validity of the traffic stop, which was based on the officers' belief that Appellant was driving carelessly. "For a stop based on the observed violation of the Vehicle Code or otherwise non-investigable offense, an officer must have probable cause to make a constitutional vehicle stop." *Commonwealth v. Harris*, 176 A.3d 1009, 1019 (Pa. 2017). Careless driving is a non-investigable offense. *See Commonwealth v. Venable*, 200 A.3d 490, 499 (Pa. 2018). To establish probable cause, the officer

> must be able to articulate specific facts possessed by him at the time of the questioned stop, which would provide probable cause to believe that the vehicle or the driver was in some violation of some provision of the Vehicle Code. Probable cause does not require certainty, but rather exists when criminality is one reasonable inference, not necessarily even the most likely inference.

*Commonwealth v. Cahill*, 324 A.3d 516, 523 (Pa. Super. 2024) (quoting *Commonwealth v. Lindblom*, 854 A.2d 604, 607 (Pa. Super. 2004).

The Motor Vehicle Code prohibits careless driving, defined as "driv[ing] a vehicle in careless disregard for the safety of persons or property[.]" 75 Pa.C.S. § 3714(a). "The *mens rea* requirement applicable to § 3714, careless disregard, implies less than willful or wanton conduct but more than ordinary negligence or the mere absence of care under the circumstances." *Commonwealth v. Gezovich*, 7 A.3d 300, 301 (Pa. Super. 2010) (internal quotations omitted).

The Commonwealth offered the following evidence to support a finding that officers had probable cause to believe Appellant drove carelessly. Officer DuBrosky testified that he and his partner were in the South Side area of Pittsburgh on March 29, 2024, and effectuated the stop "after we observed [Appellant] driving carelessly in a high pedestrian traffic area." N.T., 10/24/24, at 6. On cross-examination, Officer DuBrosky agreed that he and his partner followed Appellant "onto Bingham Street," and then "around the market that's nearby," which has "very narrow roads" and "vehicles parked along the side[.]" *Id.* at 11-12. When Appellant suggested that the presence of such vehicles "[l]imited the speed that a person can go," Officer DuBrosky replied, "[the parked vehicles limit] the speed that they could safely go around the market[.]" *Id*. at 12. On re-direct, Officer DuBrosky testified:

> Q. And careless driving that could be too fast for conditions as you've stated in the body cam?

A.  Yeah.  The South Side is a very high pedestrian traffic area especially on weekend nights, like Thursdays through Sundays; a lot of foot traffic.  So when vehicles drive at a higher rate of speed it increases the chance of someone getting hurt.

Q.  Right.  And there's a lot of bars in that area too?

A.  Yeah.

Q.  And pedestrians as well?

A.  That's correct.

*Id.* at 23.[3]

Appellant alleges that the testimony presented fails to establish probable cause, as neither officer "testified to specific observations that indicated [Appellant] was driving with more than ordinary negligence or the mere absence of care."  Appellant's Brief at 19.  Appellant argues that the trial court "cite[d] solely to Officer DuBrosky's blanket statement that he 'observed the vehicle driving carelessly in a high pedestrian traffic area,'" which he submits is unsupported by the record.  *Id.* at 20.

Turning to caselaw, Appellant argues that our unpublished decision in *Commonwealth v. Leas*, No. 1541 MDA 2018, 2019 WL 2067761 (Pa. Super. filed May 9, 2019) (non-precedential decision), persuasively supports the conclusion that probable cause was lacking.[4]  In *Leas*, police officer Duane

---

[3] We take judicial notice that the traffic stop occurred on a Friday.  *See Commonwealth v. Brown*, 839 A.2d 433 (Pa. Super. 2003) (holding a judicially noticed fact is one not subject to reasonable dispute in that it is capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned).

[4]  *See* Pa.R.A.P. 126(b) (authorizing citation to non-precedential decisions filed after May 1, 2019 for their persuasive value).

Witman was stopped at a traffic light at an intersection he described as "'highly traveled' and the site of many accidents." *Id.* at *1 (quoting transcript). Officer Witman, who was in the rightmost lane, saw Leas' vehicle in the adjacent left-turn only lane. *Id.* Leas was acting "'fidgety'" and began "inching past the traffic stop line." *Id.* When the light turned green, Leas "accelerated abruptly, causing his tires to squeal, and turned left onto Lancaster Avenue. In so doing, Leas turned into the middle lane of travel instead of the left lane, partially impeding the entrance of traffic from the opposite side of the intersection." *Id.* While the officer testified that "cars were around," he "was unable to attest to Leas's speed beyond stating that the vehicle's movement was not smooth and the turn was 'quick.'" *Id.* at *3. The officer stopped Leas for driving carelessly.

The trial court granted suppression and the Commonwealth appealed; we affirmed, concluding that Officer Witman's testimony failed to establish probable cause to believe Leas drove carelessly. We stated that caselaw "consistently focuse[s] on the creation of a hazard," and found that the testimony failed to establish a hazard. *Id.* at *2. "[T]here is no evidence that Leas created a hazard by weaving in and out of lanes, fishtailing into the adjacent lane, endangering pedestrians, risking damage to the curb or nearby property, venturing into oncoming traffic, or causing other vehicles to swerve to avoid a collision." *Id.* at *3.

We do not agree that *Leas* involves comparable facts. As Appellant recognizes, our conclusion therein rested on the Commonwealth's failure to

- 6 -

establish any type of hazard. Appellant's Brief at 21 (arguing that, "[a]s in *Leas*, there was no evidence presented that [Appellant] 'created a hazard'") (citation omitted). We agree that there was "was no testimony that officers observed [Appellant] hit or almost hit a person, another vehicle, or the curb." *Id.* While those acts may be sufficient to establish probable cause, they are not necessary. "[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232 (1983). The *Leas* decision involved one single act of accelerating rapidly, whereas here Appellant drove his vehicle at a high rate of speed in an area frequented by pedestrians and where cars were parked along one of the roads. This incident occurred on a Friday evening at approximately 11:30 p.m.,[5] a time when pedestrians were likely to be milling about and walking to and from the numerous bars in the area. Thus, the testimony established probable cause to believe that Appellant's actions were in violation of the careless driving statute. Therefore, we conclude that officers lawfully detained Appellant on that basis.

Appellant's second issue addresses the officers' actions during the traffic stop. As Officer Halaszynski approached the passenger side of the vehicle, he "observed multiple occupants inside the vehicle." N.T., 10/24/24, at 27. Appellant was in the driver's seat, and the remaining three occupants were all

---

[5] The bodycam footage introduced at the suppression hearing begins as the officers exit their patrol vehicle. The timestamp bears a time of 11:29 p.m.

in the backseat. *Id.* The officer then "observed the pistol sitting on the passenger seat." *Id.* Additionally, the Commonwealth introduced Officer Zablonski's bodycam footage, which was included in the certified record on appeal. The footage shows that Officer Zablonski asked Appellant to step out of the vehicle approximately fifteen seconds after knocking on Appellant's window, with Officer Halaszynski approaching the passenger side. Officer Zablonski then began a patdown and asked, "You got anything in the car?" Appellant replied, "No." Meanwhile, Officer Halaszynski seized the firearm.

Appellant's argument in support of reversal relies on a combination of three cases. First, pursuant to *Terry v. Ohio,* 392 U.S. 1 (1968), which supplies authority to detain individuals upon reasonable suspicion that criminal activity is afoot, a potential officer safety concern, standing alone, does not justify a seizure. *See Commonwealth v. Gibson*, 333 A.3d 710, 722 n.11 (Pa. Super. 2025) ("[U]nder *Terry*, an officer cannot manufacture the basis for a frisk by initiating an investigative detention. The officer safety rationale permits a frisk during a valid detention, it does not, however, independently authorize a detention in the first instance."). Next, in *Commonwealth v. Hicks*, 208 A.3d 916, 923 (Pa. 2019), our Supreme Court held that the mere fact an individual possesses a firearm does not create reasonable suspicion of criminal activity, as "it is not a criminal offense for a license holder … to carry a concealed firearm[.]" *Id.* at 936. Thus, the fact officers saw a firearm near Appellant did not supply a basis to suspect he was committing any crime. Finally, Appellant devotes much of his argument to

our decision in **Commonwealth v. Malloy**, 257 A.3d 142 (Pa. Super. 2021), which concluded that officers unlawfully prolonged a traffic stop when questioning a backseat passenger to ascertain his legal entitlement to carry a concealed firearm. Taken together, Appellant argues that the officers could not investigate whether Appellant had a license to carry.

We begin with a discussion of **Malloy**. In that case, Officer Stephen Henry stopped a vehicle in which Malloy was a backseat passenger. **Id.** at 145. While speaking to the occupants, Officer Henry noticed Malloy wearing a lanyard, which prompted him to ask Malloy if he had a firearm as "in his experience ... it was common for people who worked in armed security positions at local bars to keep their identification badges in lanyards." **Id.** Malloy replied that he did, explaining that he worked security at a local bar and that he and the other occupants had just finished their shift. **Id.** Officer Henry then asked Malloy to step outside the vehicle, secured Malloy's weapon, and investigated whether Malloy could legally carry the firearm. **Id.** The investigation took approximately fifteen to twenty minutes, and ended in Malloy's arrest. **Id.** at 146.

On appeal, we agreed with Malloy that Officer Henry unlawfully prolonged the stop under **Rodriguez v. United States**, 575 U.S. 348, 350 (2015), as the officer lacked reasonable suspicion that Malloy had engaged in any criminal activity. **Id.** at 147. We first determined that the vehicle was lawfully stopped. Thus, per **Rodriguez**, the seizure was constitutionally justified only for "the time needed to handle the matter for which the stop was

made[.]" *Id.* We stated that the transcript was "less than definitive" on this point and thus "assume[d] that Officer Henry's efforts to verify the driver's license, determine the existence of outstanding warrants against the driver, and confirm the automobile's registration and proof of insurance were ongoing when he requested identification from [Malloy] and that mission-related tasks could not reasonably have been concluded by that time." *Id.* at 151.

We then disagreed with the trial court's conclusion that "Officer Henry's request for documentation of [Malloy]'s authority to carry a firearm constituted an ordinary inquiry incident to the traffic stop that police officers are permitted to make." *Id.* at 153. "[A] passenger's legal authority to own or possess a firearm is simply unrelated to a driver's authority to operate a motor vehicle, the existence of outstanding warrants against the driver, and whether a lawfully detained vehicle is properly registered or insured." *Id.* at 152. We added that the "seizure of the firearm essentially eliminated any immediate risk the weapon posed to law enforcement personnel, bystanders, and occupants of the vehicle for the duration of the stop and transformed the officer's pursuit of [Malloy]'s firearms credentials into an inquiry exclusively aimed at collecting evidence of collateral wrongdoing." *Id.* at 153. Finally, we disagreed that there was independent reasonable suspicion to detain Malloy. *Id.* at 154. The trial court therefore erred by denying suppression. *Id.*

In *Commonwealth v. Hawkins-Davenport*, 319 A.3d 537 (Pa. Super. 2024), *appeal granted*, 333 A.3d 300 (Pa. 2025), we discussed *Malloy*.

- 10 -

Officers stopped Hawkins-Davenport for a traffic offense and almost immediately observed a gun in plain view on the passenger seat. *Id.* at 541. The trial court found that the officer seized the firearm before asking any questions about whether Hawkins-Davenport had a permit, and there was no evidence that Hawkins-Davenport posed a danger as he did not make movements towards the firearm. *Id.* at 542. As a result, the trial court concluded that the officers unlawfully seized the firearm and ordered suppression.

The Commonwealth appealed and we reversed. First, we concluded that the firearm could be seized as a *per se* matter due to officer safety concerns. *Id.* at 546 ("We now find that police officers may, as a reasonable precaution for their safety, remove a firearm they see in plain view that is accessible by the driver, during an ongoing valid traffic stop[,] as a matter of course."). Because this rule is based on officer safety and the threat posed by a firearm, officers need not determine whether the driver or any other occupant is legally permitted to carry. *Id.* Accordingly, *Hicks* is not implicated with respect to the seizure because the authority to detain is supplied by a valid basis to effectuate a traffic stop, and the authority to seize the firearm is due to officer safety. *Id.* at 548.

Finally, because the foregoing analysis addresses only the officer's authority to seize the firearm, the remaining question was whether the firearm had to be suppressed. The ***Hawkins-Davenport*** Court stated that "this case does not involve an allegation that the police impermissibly extended the

traffic stop to ascertain the status of Hawkins-Davenport's concealed carry licensure, such as in *Malloy*[.]" *Id.* at 549. Alternatively, we concluded that *Malloy* would not support a request for relief under *Rodriguez* because "[t]he events in this traffic stop happened in quick succession." *Id.* After seizing the firearm, the officer "asked Hawkins-Davenport within seconds if he had a permit to carry the gun." *Id.* Hawkins-Davenport immediately replied that he did not and was arrested. "Unlike the officer in *Malloy*, Officer Torres did not initiate a separate and prolonged investigation into whether Hawkins-Davenport possessed documents permitting him to carry a firearm." *Id.*

Appellant concedes that the officers were authorized to seize the firearm because of officer safety concerns. Appellant's Reply Brief at 10. However, Appellant argues that the officers "were not permitted … to initiate a secondary investigation into [Appellant]'s authority to carry a firearm, which bore no relevance to the reason for the traffic stop, his safe operation of a motor vehicle, or officer safety." *Id.* at 11-12. Therefore, Appellant submits that the officers were entitled to seize the firearm but not permitted to ask Appellant any follow-up questions absent additional behaviors or facts suggesting criminality.

*Hawkins-Davenport* indicates that a question regarding the driver's ability to legally carry a firearm is a fair topic, provided the inquiry does not extend the traffic stop beyond the time needed to complete its mission. *See Hawkins-Davenport*, 319 A.3d at 549 (noting that the officer "saw the firearm out in the open, removed the firearm through the open passenger side

window, and asked Hawkins-Davenport within seconds if he had a permit to carry the gun"). **But see Commonwealth v. Froehlich**, No. 606 WDA 2022, 2023 WL 8828685 at *11 (Pa. Super. filed December 11, 2023) (non-precedential decision) (rejecting argument that "as long a[s] the traffic stop is brief, looking into a passenger's firearm status is a 'mission related' inquiry that requires no independent justification"). Indeed, **Malloy** suggests the opposite result, as the Court held that questions about Malloy's authority to carry was beyond the scope of the mission.

> Here, neither the trial court nor the Commonwealth cite legal authority which equates an investigation of a passenger's documented authority to carry a firearm to the incidental inquiries permitted during a lawful traffic stop under **Rodriguez** and which promote safe and financially responsible operation of motor vehicles. More tellingly, neither the trial court nor the Commonwealth offer any explanation as to how or why a passenger's firearms licensure status relates to these incidental inquiries or, more broadly, to the safe and financially responsible operation of a motor vehicle in general.

**Malloy**, 257 A.3d at 152.

We decline to address whether the distinction between passenger and driver warrants a different result, as **Malloy** does not hold that any type of police questioning about ownership of a firearm is completely forbidden. It was clear that Malloy exclusively possessed the firearm, as it was on his hip. **Id.** Similarly, in **Froehlich**, we concluded that for officer safety reasons "police may ask for a passenger's identification and, upon discovering the presence of a firearm, may request the owner to identify himself or herself as

- 13 -

a function of preserving on-scene officer safety without independent constitutional justification." *Froehlich*, 2023 WL 8828685 at *10.

In contrast to *Malloy*, Appellant did not physically possess the firearm, and nobody claimed ownership as in *Froehlich*. Instead, when Officer DuBrosky asked Appellant if there was anything in the car, he replied, "No." At that point, the officers were faced with a firearm that was recovered from the passenger seat, and neither Appellant nor the backseat occupants claimed ownership. Combined with the fact that Officer DuBrosky testified that he saw Appellant make furtive movements towards the passenger seat, we conclude that the officers possessed reasonable suspicion at that juncture to investigate whether Appellant could legally carry the firearm. Accordingly, the trial court did not err in denying suppression.

Appellant's third and final issue asserts that the evidence was not sufficient to convict him of carrying a firearm in his vehicle without a license. The statute provides that "[A]ny person who carries a firearm in any vehicle … without a valid and lawfully issued license under this chapter commits a felony of the third degree." 18 Pa.C.S. § 6106(a)(1).

Our standard of review is well-settled.

> We must determine whether the evidence admitted at trial, and all reasonable inferences drawn therefrom, when viewed in a light most favorable to the Commonwealth as verdict winner, support the conviction beyond a reasonable doubt. Where there is sufficient evidence to enable the trier of fact to find every element of the crime has been established beyond a reasonable doubt, the sufficiency of the evidence claim must fail. The evidence established at trial need not preclude every possibility of innocence and the fact-finder is free to believe all, part, or none

of the evidence presented. It is not within the province of this Court to re-weigh the evidence and substitute our judgment for that of the fact-finder. The Commonwealth's burden may be met by wholly circumstantial evidence and any doubt about the defendant's guilt is to be resolved by the fact[-]finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances.

***Commonwealth v. N.M.C.***, 172 A.3d 1146, 1149 (Pa. Super. 2017) (quoting

***Commonwealth v. Rodriguez,*** 141 A.3d 523, 525 (Pa. Super. 2016)).

Caselaw requires the Commonwealth to establish, beyond a reasonable doubt, that Appellant possessed the firearm. As Appellant did not physically possess the firearm, the Commonwealth relied on the theory of constructive possession. ***See Commonwealth v. Cruz***, 21 A.3d 1247, 1253 (Pa. Super. 2011) ("Illegal possession of a firearm may be shown by constructive possession."). Our Supreme Court has summarized the doctrine as follows:

Where possession is an element of the offense, the concept of constructive possession is a legal fiction used to prove the element although the individual was not in physical possession of the prohibited item. The evidence must show a nexus between the accused and the item sufficient to infer that the accused had the power and intent to exercise dominion and control over it.

Dominion and control means the defendant had the ability to reduce the item to actual possession immediately, or was otherwise able to govern its use or disposition as if in physical possession. Mere presence or proximity to the contraband is not enough. Constructive possession can be established by inferences derived from the totality of the circumstances.

***Commonwealth v. Peters***, 218 A.3d 1206, 1209 (Pa. 2019) (citations

omitted; paragraph break added).

- 15 -

Appellant submits that this is a case of mere presence. Appellant's Brief at 31. He avers that the only concrete movement linking him to the firearm was the officer's report of furtive movements, which "is not sufficient to establish constructive possession." *Id.* at 32 (quoting *Commonwealth v. Boatwright*, 453 A.2d 1058, 1059 (Pa. Super. 1982)). Additionally, Appellant cites the three males in the vehicle's backseat, arguing that those males had equal access to the firearm. *Id.* at 31.

We disagree with the conclusion that the individuals in the backseat had equal or greater access to the firearm. Appellant cites *Commonwealth v. Heidler*, 741 A.2d 213 (Pa. Super. 1999) (*en banc*) and *Commonwealth v. Wisor*, 353 A.2d 817 (Pa. 1976), in support. Both cases are readily distinguishable.

In *Heidler*, John Heidler and his girlfriend left their home to pick up Heidler's son at his middle school. *Heidler*, 741 A.2d at 214. During the drive, Heidler handed his girlfriend his gun, who placed it in her purse. *Id.* Heidler then parked his vehicle and entered the school. *Id.* However, unbeknownst to Heidler, his estranged wife had obtained a temporary PFA order and informed the school of its existence. *Id.* at 215. School officials summoned police, who then served the PFA on Heidler and spoke to him and his girlfriend. *Id.* Heidler's girlfriend told police about the gun and Heidler was charged with possessing a gun on school property. *Id.* In reversing his conviction, we concluded that Heidler did not have equal access to the purse. *Id.* at 216. "[T]he only person that could be deemed to have access to the

- 16 -

purse was its owner—the passenger in [Heidler's] vehicle." *Id.* Therefore, Heidler "cannot be deemed to have the necessary power to control or intent to control the gun." *Id.*

In *Wisor*, a police officer saw a vehicle parked in a shopping center. *Wisor*, 353 A.2d at 817. The vehicle appeared unoccupied and when the officer approached, a "young woman ... sat up." *Id.* The officer departed but continued to watch the vehicle from a distance with binoculars. *Id.* Over a period of ten minutes, the officer saw people walk over to the vehicle. *Id.* He then pulled up behind the car and detained Wisor, who was sitting behind the wheel. *Id.* at 818. Five other passengers were in the car. *Id.* The officer asked everyone to exit. *Id.* The front-right passenger pushed the seat forward to allow the backseat occupants to exit, and the officer saw a marijuana pipe "lying in the space beneath the back of the right-front passenger's seat. The pipe was made visible only after the front-right passenger's seat was pulled forward." *Id.*

Wisor was charged with possession of the pipe and our Supreme Court discharged his conviction, finding the Commonwealth failed to establish possession. "The facts disclose that the other occupants of [Wisor's] car had ample opportunities to place the pipe in the crevice behind the front-right passenger's seat. Because of the presence of these other persons in the car, [Wisor] did not have exclusive control of the area where the pipe was found." *Id.* It was "possible that the pipe was placed there by one of the other persons before [Wisor] entered the car or as the police were approaching." *Id.* at 819.

Additionally, "the location of the drugs was such that they were easily accessible to others, such as the female who was alone in the car for a period of time prior to [Wisor]'s presence in the car, or the other occupants of the car." *Id.*

Both cases are distinguishable. *Heidler* involved a case where another person had superior, if not exclusive, access to the weapon. *Wisor* involved contraband that was not visible until the front passenger moved the seat forward to allow the backseat occupants out. While the case is similar in that it also involves the presence of multiple people in the backseat, the firearm in Appellant's car was not located under a seat but on the empty front passenger seat next to Appellant, the driver. *See* N.T., 10/24/24, at 7-8 (reflecting that Officer DuBrosky testified that the gun was on the front passenger seat "sitting right next to [Appellant]").

Indeed, we conclude that the totality of the circumstances warranted the inference that Appellant had superior access to the firearm as compared to the passengers. Our decision in *Commonwealth v. Parrish*, 191 A.3d 31, 32 (Pa. Super. 2018), illustrates the point. There, a police officer conducted a traffic stop and spoke to the driver; officers "observed [the driver] straddling the center console between the two front seats and the grip of a silver handgun protruding from under the front passenger seat. The officers further observed [Parrish] seated behind the driver's seat with his hands on the headrest of the driver's seat." *Id.* at 33. Officers seized the silver handgun and a search revealed additional contraband in a black satchel on the

passenger-side floor. *Id.* at 37. We held that the evidence was insufficient to establish constructive possession of any of the items. With respect to the firearm located under the seat, we stated: "[W]e fail to see how the jury could reasonably conclude that [Parrish], while sitting in the back seat of the vehicle, had dominion and control over the gun under the passenger-side front seat[.]" *Id.* at 38.

Similarly, it would be difficult to conclude that the backseat occupants had dominion and control over the gun recovered from the front passenger seat based strictly on their presence and proximity. In *Parrish*, the Commonwealth argued that the officer observed the vehicle "rocking back and forth" after the driver pulled over, and suggested that Parrish "jettison[ed] himself away from the contraband located in the front seat[.]" *Id.* at 38. We deemed this too speculative, as it was "equally reasonable to infer that the rocking was caused by" the driver, who was straddling the console. *Id.* In this case, there is no indication of furtive movements by anyone other than Appellant. This, combined with Appellant's superior physical access to the firearm, permitted the trial court to "reasonably infer that the defendant exercised dominion and control over the contraband at issue." *Id.* at 37. *See also Commonwealth v. Carter*, 450 A.2d 142, 144 (Pa. Super. 1982) (holding that evidence sufficed to establish driver constructively possessed the firearm located on the floor of passenger seat; "The evidence ... also established that none of the other occupants of the vehicle had had an

opportunity in the period between the stop and the discovery of the gun to place the gun on the floor.").

While it is possible one of the backseat passengers placed the firearm on the seat, "the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence." ***Commonwealth v. Bullick***, 830 A.2d 998, 1000 (Pa. Super. 2003) (quoting ***Commonwealth v. Gooding***, 818 A.2d 546, 548 (Pa. Super. 2003)). Furthermore, the implausibility of Appellant's statement that nothing was in the vehicle is additional circumstantial evidence. Thus, we conclude that the evidence sufficed to enable the trial court to conclude that Appellant constructively possessed the firearm.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 3/3/2026